UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHRISTOPHER GREEN,<br><br>*Defendant.* | Criminal Action No. 19-19 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Christopher Green is charged with participating in a Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, conspiracy and engaging in an array of related, criminal acts. According to the superseding indictment, the "principal goal" of the RICO conspiracy "was to obtain as much money and things of value as possible through armed robberies and the trafficking of controlled substances, including PCP." Dkt. 12 at 2. Among other charges, the superseding indictment avers that Green participated in the armed-robbery-turned-murder of Zaan Scott on April 9, 2017, *id.* at 7–8, 9–10 (Counts Four, Five, and Ten), and the murder of Jan Cotto on April 6, 2017, *id.* at 6–7 (Counts Two and Three). The Scott murder allegedly occurred in the District of Columbia, and the Cotto murder allegedly occurred just across the border in Maryland. *Id.* at 5–6, 9–10.

After Green was arrested and charged under Maryland law with the Cotto murder, and while he was in pretrial custody in Prince George's County, Maryland, on that charge, two Metropolitan Police Department ("MPD") detectives interviewed him regarding the Scott murder. Because those detectives did not apprise Green of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court must determine whether Green was in "custody" for purposes of

*Miranda*. According to the government, he was not in "custody" and thus *Miranda* does not foreclose admission of his statements at trial, Dkt. 22, while Green disagrees and requests that the Court suppress the statements, Dkt. 29.

All agree that Green was handcuffed to the wall during the interview, and, in any event, was not free to leave the Prince George's County detention facility, where he was held on charges relating to the Cotto murder. But under controlling Supreme Court precedent, that does not end the inquiry. Rather, for purposes of *Miranda*, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). The Court must thus decide "whether, in light of 'the objective circumstances of the interrogation,' . . . a 'reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave.'" *Id.* at 509 (brackets in original) (first quoting *Stansbury v. California*, 511 U.S. 318, 322–23 (1994) (per curiam); and then quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

Under the totality of the circumstances of Green's questioning—including the interrogating detective's repeated reminders that Green was free to cease answering questions and return to his cell at any time—the Court concludes that a reasonable person in Green's position would have felt free to terminate the interview and to return to his cell. And, for similar reasons, the Court is unpersuaded by Green's separate contention that his statements were involuntary. The Court, accordingly, will **GRANT** the government's motion to admit Green's statements and will **DENY** Green's motion to suppress.

## I. BACKGROUND

**A.     Factual Background**

Of the many allegations underlying the charges against Green, two are of particular

relevance here.  First, according to the government, Green shot and killed Jan Cotto in Capitol Heights, Maryland on April 6, 2017.  Dkt. 20 at 1.  Second, the government alleges that Green attempted to rob Zaan Scott outside of a convenience store in the District of Columbia on April 9, 2017.  Dkt. 12 at 7–8; Dkt. 21 at 1–2.  When Scott resisted, Green's alleged accomplice shot Scott.  Dkt. 20 at 1–2; *see also* Dkt. 21 at 1.  Scott "was immediately paralyzed from the waist down," and "[h]e died a little over a month later as result of the shooting."  Dkt. 21 at 1.

Nearly two months' later, on June 27, 2021, MPD detectives Brian Brador and Stephanie Garner visited the Prince George's County, Maryland detention facility where Green was detained on charges relating to Cotto's murder.  Dkt. 22 at 1.[1]  Although Cotto's murder and Scott's murder are now both part of this federal case, *see* Dkt. 12, at the time the two incidents were being investigated separately by the relevant local authorities.  Brador and Garner, as MPD detectives, were there to question Green solely about Scott's murder in the District of Columbia.  *See* Dkt. 55 at 8–10, 24.  Because the Cotto murdered occurred in Maryland, Dkt. 20 at 1, that crime lay beyond their jurisdiction.

At Brador and Garner's request, Green was escorted to a "private secure room" at the Prince George's County detention facility.  *Id.* at 9–10.  The room measured nine feet by nine feet, according to Brador's estimate, and had no windows.  *Id.* at 10.  Brador and Garner sat on one side of a table, while Green sat opposite them.  *Id.*  Pursuant to the facility's policy for "contact visits"—that is, visits in which a detainee and visitors are not separated by a barrier, Dkt. 49-1 at 1 (Dixon Decl. ¶ 4)—one of Green's wrists was handcuffed to the wall for the duration of the interview, Dkt. 55 at 11.

---

[1] Although the transcript of the questioning at issue here spells Detective Brador's name as "Bradol," *see* Dkt. 22-2, at the evidentiary hearing on this matter the government clarified that "Brador" is the correct spelling, Dkt. 55 at 6.

3

Brador began the interview by "go[ing] over" a few "things" in light of the fact that Green was "locked up." He explained:

> First of all, I know you're strapped to the . . . wall right now[] and you're in a jail garment. For one, you know, we'd like to talk to you about what we're investigating. Okay? But of course, before that[,] you have to understand that this interview . . . will be voluntary, okay. Whether you wanna talk to us or not, whether you want listen or not[,] [i]t is all up to you.
>
> Even though you're handcuffed, you can end the interview at any time, you know. . . .

Dkt. 22-2 at 3. Brador continued:

> I just closed the door. That's . . . for privacy in case anybody walks by again. So – because you're locked up for whatever other charge it is, we're not here to talk to you about that. We're not interested in that case. We're not here to jam you up on anything. We're not here to make your case better or worse. Okay. The only reason we're here is to talk about an investigation that we're conducting in D.C. All right.
>
> Now, you're locked up right now. We can't change that. We can't set you free. We can't break you outta here. We can't do anything like that. So when I talk about the interview being voluntary, at any point you don't wanna talk to us[,] we can just knock on the door[,] and we can tell the guard you don't wanna talk to us[,] and he'll take you right back to wherever you were in a cell, or wherever you were. All right. It's all completely up to you.
>
> If you wanna just hear us out for a moment and . . . then talk or not talk, that's up to you also. So you're . . . pretty much in complete control of this interview here, this conversation. Okay. I just wanted you to be aware of that. All right?

*Id*. at 4. Brador then asked Green whether he "wish[ed] to talk to us for a moment and listen to what we have to say?" *Id*.

In response, Green told that detectives that he wanted "like to hear what" they were "talking about" because he wanted "to figure out what[] [wa]s going on." *Id.* at 5. Brador then explained that he and Garner were investigating an armed robbery that occurred in April 2017; that "someone [was] shot" in the course of the robbery; and that the victim had been "able to identify people . . . who were involved." *Id.* at 5–6. The detectives wanted to talk to Green,

4

Brador continued, because Green's "name came up in the investigation." *Id.* at 6. At this point, Brador again emphasized:

> Of course, like I said again, I mean, you talking to use is completely voluntary. Okay. I understand you can't just walk outta here[,] and you . . . feel like you're forced to [be] here because[,] you know, you're handcuffed, but like I said[,] if at any moment you . . . want to shut the f--- up you, you want us to shut up and stop talking to you[,] all you gotta say is I don't wanna talk. We'll . . . get the guard[,] and you'll . . . be on your way. Okay?

*Id.* at 7–8. Green responded, "Okay." *Id.* at 8.

In the course of the ensuing interview, Green denied any knowledge of the robbery, saying that he felt "frustrated" and "railroaded" by the detectives' questions. *Id.* at 11. Brador and Garner kept pressing, however, and when Green asked if he was "being accuse[d] of shooting someone," Brador responded, "yes." *Id.* at 14. Brador then told Green, "somebody's got to fess up to it and right now, I mean, what we've learned in the investigation is that you, you were, you were the shooter in this case." *Id.* at 15. After some further prodding, Green acknowledged that he got into a fight with a stranger on the evening in question and that during the ensuing scuffle someone "start[ed] shooting." *Id.* at 18–20. Green repeatedly emphasized, however, that he did not shoot anyone. *See, e.g.*, *id.* at 18–22.

Brador and Garner asked Green to identify the shooter. When Green refused, Brador responded with seeming frustration. "I can't talk for you," he told Green, "I can't sit in your chair and, and save myself . . . You have to do it." *Id.* at 26. After Green continued to insist that he did not fire any shots, Brador said, "the guy who got shot was lying then, huh?" *Id.* at 36. Green again asked if he was "being charge[d] with a crime or something," prompting Brador to clarify, "[n]o, you're not." *Id.* at 39. Immediately thereafter, Brador once again reminded Green:

> Like I said, . . . this conversation between us is voluntary. Purely voluntary. If

5

> you don't wanna talk to us, you don't have to talk to us. If you wanna – you know, I could get the guard to take you back outta here. I don't want you to feel at any point like I'm forcing you to come in and talk to us and have a conversation. It's completely up to you, Chris. All right.

*Id.* at 39-40.

At one point, Green said, "I don't wanna do this no more." *Id.* at 44. But his voice was barely audible, and when Garner responded, "[s]ay what," Green returned to a common refrain: "I say I don't do it . . . I ain't shoot nobody." *Id.* at 44. The detectives resumed their questioning, and eventually Green identified an individual named "E" as the "one that shot [Scott]." *Id.* at 47. Green denied knowing "E" well, and denied taking any of Scott's possessions following their altercation. *Id.* at 33. Brador and Garner probed for further details regarding the shooting, to little avail, before Brador concluded by reminding Green that, "like I said, the interview was voluntary." *Id.* at 78.

The entire interview lasted about an hour, and at no point during that time did Brador or Garner inform Green of his *Miranda* rights. Dkt. 55 at 14.

**B.     Procedural Background**

On January 25, 2019, Green was indicted by a federal grand jury on three counts: Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1); First Degree Murder While Armed (Felony Murder), in violation of 22 D.C. Code §§ 2101 & 4502; and Attempted Armed Robbery, in violation of 22 D.C. Code §§ 2801, 2802, & 4502. *See* Dkt. 1. On December 12, 2019, the grand jury returned a superseding indictment, now with thirteen counts: Conspiracy to Participate in a Racketeer Influenced and Corrupt Organization, in violation of 18 U.S.C. § 1962(d) (Count One); Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts Two and Four); Unlawful Possession of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. 924(c)(1)(A) (Counts Three, Five, and Seven);

6

Kidnapping in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Six); Assault with a Dangerous Weapon, in violation of D.C. Code § 402 (Count Eight); Possession of a Firearm During a Crime of Violence or Dangerous Offense, in violation of 22 D.C. Code §§ 401 & 4502 (Counts Nine. Eleven, and Thirteen); First Degree Murder While Armed, with Aggravating Circumstances, in violation of D.C. Code §§ 2101, 4502, and 2104.01(b)(8) (Count Ten); and Attempt to Commit Robbery While Armed, in violation of 22 D.C. Code §§ 2801, 2802, and 4502 (Count Twelve).  Dkt. 12.  Green pleaded not guilty, *see* Minute Entry (Dec. 13, 2019), and the case is set for trial beginning on October 28, 2021, *see* Minute Entry (Sept. 23, 2021).

The government moves to admit Green's statements to Brador and Garner at the Prince George's County detention facility, Dkt. 22, and Green moves suppress those statements, Dkt. 29.  The Court held an evidentiary hearing on both motions, at which Brador testified regarding the jailhouse interview.  *See* Minute Entry (Sept. 10, 2021); Dkt. 55.[2]

## II. ANALYSIS

All agree that Brador and Garner did not inform Green of his *Miranda* rights before or during the June 27, 2017 interview at the Prince George's County detention facility.  The issue at hand—and the core of the parties' dispute—is whether Green was in "custody" for purposes of *Miranda*, and, in particular, whether "a reasonable person" would have felt free "to terminate the interview and to leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

---

[2] The government has filed two others motions *in limine*: a motion to admit prior consistent statements, Dkt. 20, and a motion to admit excited utterances, Dkt. 21.  The Court took both motions under advisement following hearings on each.  *See* Minute Entry (Sept. 10, 2021); Minute Entry (Sept. 14, 2021).  Because the nature of the testimony and the parties' arguments at trial will bear on those motions, the Court will defer ruling on them until trial.  The government, moreover, recently notified the Court that it intends to modify and to supplement its request to admit the excited utterances, and thus that motion is not currently ripe for resolution.

In the government's view, Green was not in "custody" for purposes of *Miranda* because, at the relevant time, he was not detained on charges relating to the Scott murder and because Detective Brador repeatedly advised him that the interview was voluntary and that he could end it and return to his cell at any time. Dkt. 22 at 2–4. Green, for his part, presses two arguments. First, he maintains that "he was in custody for purposes of *Miranda*[] because his freedom of movement was constrained by the detectives in a significant way," and, indeed, "he was chained to a wall for the purposes of interrogation." Dkt. 29 at 5. Second, he argues that his statements were "involuntary" and, as such, their admission would violate the Constitution irrespective of his custodial status. Dkt. 29 at 3–5; *see also United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991) ("A confession is inadmissible as a matter of due process if under the totality of the circumstances it was involuntarily obtained (for example, if the police beat a confession out of an individual after he validly waives his *Miranda* rights).").

The Court will address each of these contentions in turn.

**A.    *Miranda***

Few legal rules are as universally recognized as the maxim that that, "[b]efore a suspect in custody is interrogated, she must be advised of her *Miranda* rights." *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020). But "[t]he obligation to apprise the suspect of her rights attaches 'only where there has been such a restriction on a person's freedom as to render [her] in custody.'" *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted)). The contours of that proviso are less universally recognized.

In a sense, Green was unquestionably in "custody" at the time of the interrogation: he was incarcerated at the Prince George's County detention facility, and his left wrist was shackled to the wall. Dkt. 55 at 11–12. But, for purposes of *Miranda*, "'custody' is a term of art that

specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 565 U.S. at 508–09.  When, as here, the defendant was already incarcerated on other charges at the time the interrogation occurred, the Supreme Court's decision in *Howes v. Fields* guides the Court's inquiry.

In *Howes*, the defendant was interrogated for between five and seven hours at a Michigan jail, where he was serving a sentence on other charges.  565 U.S. at 502–03.  He was escorted to the conference room by two sheriff's deputies but "was told that he was free to leave and [to] return to his cell . . . whenever he wanted."  *Id*. at 503.  "The two interviewing deputies were armed during the interview, but [the defendant] remained free of handcuffs and other restraints."  *Id.*  Eventually, the defendant "confessed to engaging in sex acts with [a 12-year-old] boy," and the defense moved to suppress that statement on the ground that the defendant was never given the *Miranda* warnings.  *Id*. at 503–04.  Although the state trial court denied that motion, a federal district court granted the defendant's petition for a writ of habeas corpus, and the Sixth Circuit affirmed.  *Id.* at 504.  In the Sixth Circuit's view, the interview was custodial for purposes of *Miranda* because the defendant was removed from the general prison population and was asked about events occurring outside the prison.  *Id.* at 504–05.

The Supreme Court reversed, holding that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*."  *Id.* at 511.  As the Court explained, the determination "whether a person is in custody" for purposes of *Miranda* requires consideration of all of the relevant circumstances, including "[1] the location of the questioning, [2] its duration, [3] statements made during the interview, [4] the presence or absence of physical restraints during the questioning, . . . and [5] the release of the interviewee at the end of the questioning."  *Id.* at 509.  Ultimately, the Court must decide, "in light of 'the objective

circumstances of the interrogation,'" whether "a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave'"—that is, to return to the general prison population. *Id.* (citations omitted). In rejecting the Sixth Circuit's *per se* test, the Supreme Court identified "three strong grounds for [its] conclusion." *Id.* at 511. "First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest." *Id.* "Second, a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release." *Id.* "Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* at 512.

Applying the analysis set forth in *Howes*, the Court concludes that Green was not in "custody" for purposes of *Miranda* for several reasons. First, and foremost, Detective Brador repeatedly and clearly advised Green that the interview was voluntary and that he was free to return to the general prison population at any time. Brador told Green three or four times during a relatively short interview that he could end the interview and return to his "cell, or wherever" he was before the interview began. Dkt. 22-2 at 4. Statements of this type are "'especially' important" in conducting the *Howes* analysis. *United States v. Hallford*, 756 Fed. Appx. 1, 7 (D.C. Cir. 2018) (quoting *Howes*, 565 U.S. at 516–17); *see also Cooper*, 949 F.3d at 748 (noting that federal agents described "the voluntary nature of the interview" to the suspect and then "asked her 'if she would agree to' answer their questions"); *United States v. McCormick*, No. 18-cr-0359, 2019 WL 6311898, at *4 (D.D.C. Nov. 25, 2019) (finding that "defendant [wa]s not 'in custody' for purposes of *Miranda*" in part because FBIt agents told him that "speaking to the agents was voluntary, and that he was free to leave at any time"). The ultimate question is

whether a reasonable person would have felt free to end the interview and to leave, *Howes*, 565 U.S. at 509, and Green was repeatedly told that he could do so.

To be sure, according to the transcript, at one point during the interview Green said, "I don't wanna do this no more." Dkt. 22-2 at 44. Although neither party addressed this statement in its briefs, it is one of the "'circumstance[s] surrounding the interrogation'" that the Court must consider. *Howes*, 565 U.S. at 509; *cf.* Cooper, 949 F.3d at 749 ("At no point did Cooper ask to end the questioning."). But, considered in context, it says little about whether a reasonable person in Green's position would have felt free to end the interrogation and return to his cell. To start, Green's statement is barely audible; government counsel had to play the recording twice at the evidentiary hearing before the parties could discern what Green said, Dkt. 55 at 17–18, and the Court separately listened to the recording several times in chambers before hearing what Green said. It is thus unsurprising that Detective Garner responded to Green's statement by asking, "You say what?" Dkt. 22-2 at 44. In response to that question, Green did not ask to end the interview or ask the detectives to return him to his cell; rather, he clarified: "I say I don't do it. I ain't shoot nobody. The dude did it." *Id.* The significance or meaning of Green's statement is thus far from clear. Detective Brador testified that he understood Green to mean that he no longer wanted to find himself in the situation he did—that is, "facing charges in Maryland" and "being investigated in D.C." Dkt. 55 at 19. That understanding is reasonable. But, in any event, when considered in context, Green's barely audible, ambiguous statement provides little (or no) support for the contention that he was in "custody" for purposes of *Miranda*. Indeed, the Supreme Court placed little (or no) weight on the far clearer and more emphatic evidence in *Howes* that the defendant "said several times during the interview that he no longer wanted to talk to the deputies." 565 U.S. at 503.

11

Several additional factors also weigh in favor of a finding that a reasonable person, in Green's position, would have felt at liberty to end the interview and to return to the general prison population. Notably, the interview lasted only between "50 minutes and to an hour," Dkt. 55 at 19–20, a far cry from the five-to-seven-hour interrogation that the Supreme Court found insufficient to create a custodial situation in *Howes*, *see* 556 U.S. at 503. Similarly, unlike in *Howes*, *id.*, the interviewing officers in this case were not armed during the interview, Dkt. 55 at 10, and, although Detective Brador closed the door to the interview room, he explained that he was doing so simply "for privacy in case anybody walks by again." Dkt. 22-2 at 4. Detective Brador also made clear that the he and Detective Garner, as MPD officers, could not affect Green's confinement on the Maryland charge. Brador stressed that he and Garner were "not [t]here to make [the Maryland] case better or worse." Dkt. 22-2 at 4. He added: "Now, you're locked up right now. We can't change that. We can't set you free. We can't break you outta here. We can't do anything like that." *Id.* Although the defendant in *Howes* had been "convicted and sentenced" and thus knew "that the law enforcement officers who question[ed] him probably lacked the authority to affect the duration of his sentence," and although Green was merely held pending trial, there no reason to believe that Green felt "'compelled to speak by fear of reprisal for remaining silent or in the hope of [a] more lenient treatment should he confess.'" *Id.* (quoting *Illinois v. Perkins*, 496 U.S. 292, 296–97 (1990)). To the contrary, as Green was informed, the charges that Green faced in Maryland lay beyond the realm of the MPD. *See* Dkt. 22-2 at 4.

Two additional factors—"the location of the questioning" and "the release of the interviewee at the end of the questioning," *Howes*, 565 U.S. at 509—provide additional (albeit modest) support for the government's position. The questioning took place in a windowless

"private secure room" that measured nine feet by nine feet. Dkt. 55 at 9–10. Given that the room included a table and at least three chairs, *see id.* at 10, Green undoubtedly found himself in close quarters with the MPD detectives. But courts have found smaller rooms insufficient to create a "custodial" setting, *see Holland v. Rivard*, 800 F.3d 224, 240 (6th Cir. 2015) (six-by-six room), and Green's counsel soundly acknowledged that the location of his questioning was no more than a "neutral factor," Dkt. 55 at 80. As for "the release of the interviewee at the end of the questioning," *Howes*, 565 U.S. at 509, the government is correct that at the conclusion of Brador and Garner's questions Green was returned to his cell. But this is not a case in which Green "stated that he needed to leave" and the detectives "allowed him to leave," which would demonstrate that he "*did in fact* feel free to terminate the interrogation and leave, since he did just that." *McCormick*, No. 18-cr-0359, 2019 WL 6311898, at *5 (citation and quotation marks omitted). Instead, the detectives simply permitted Green to return to his cell (that is, to return to the status quo) at the end of the interview. Accordingly, that fact weighs only modestly in favor of the government.

Green's principal argument rests on the only remaining factor—"the presence or absence of physical restraints during the questioning," *Howes*, 565 U.S. at 509. As the government acknowledges, Green's left hand was handcuffed to the wall during his questioning. Dkt. 22 at 1; Dkt. 55 at 11–12. To be clear, there is no evidence that Green was placed in an uncomfortable or stressful posture. Detective Brador testified that he did not "recall [Green] having his arm like hanging or up against the wall" and he likewise did not "recall [Green] appearing uncomfortable or anything like that." Dkt. 55 at 12. Rather, according to Brador, Green's hand or arm was able to rest on the table for the duration of the interview. *Id.*

Green nonetheless maintains that he was in custody because he "could no longer walk away" and, therefore, was "not free to leave." Dkt. 29 at 5. But that misunderstands the relevant test. Although "the presence . . . of physical restraints during questioning" is, of course, relevant to the Court's inquiry, *Howes*, 565 U.S. at 509, it is just one factor that weighs in the balance. And in weighing that factor, the key question is whether the restraint at issue is atypical in the relevant prison setting: Did it create a change in circumstance that might "give rise to coercive pressure," *id.* at 511, or would it lead a reasonable person to believe he "'was not at liberty to terminate the interrogation and leave?'" *id.* at 509. Or, put differently, would the detainee "have been subject to this same restraint even if he had been taken to the conference room for some reason other than police questioning?" *Id.* at 515. The defendant in *Howes*, although he was not handcuffed, was not free to leave the jail or even to return to his cell without a prison escort. *Id.* But the fact that he was escorted by guards and "was not free to leave the conference room by himself" was insufficient to create a custodial situation because "under no circumstances could he have reasonably expected to be able to roam free." *Id.* at 515–16.

Similar logic applies here. In response to the Court's inquiry, the government submitted a declaration from Jason Dixon, a lieutenant with the Maryland Department of Corrections, regarding his Department's "general practices of restraining inmates" during visits. Dkt. 49-1 at 2 (Dixon Decl. ¶ 6). There are, according to Dixon, two kinds of visits at the Prince George's County detention facility—"contact visits" and "non-contact visits." *Id.* During "contact visits" detainees are "restrained by one handcuff attached to a wall in the interview room." *Id.* at 1 (Dixon Decl. ¶ 4). Examples of "contact visits" include "a visit by a defense attorney meeting with a detained client," along with questioning "by law enforcement from an outside jurisdiction." *Id.* For "non-contact visits"—such as "social visits"—detainees are "not

14

restrained," but they must remain "in [a] locked room," separated from any visitors by "by a wall with a large plexiglass window." *Id.* at 1–2 (Dixon Decl. ¶ 5).

Understood in this light, it seems clear that even if Green "had been taken to the conference room for some reason other than police questioning," *Howes*, 565 U.S. at 515, he would have been subject to the same restraint—a single handcuff attached to the wall, *see* Dkt. 55 at 11 (noting that "[o]nly [Green's] left arm was restrained to the lower portion" of the wall). For example, even if Green's attorney, rather than MPD detectives, had visited him, his wrist would have been handcuffed in the same way—and in no situation would Green have been free to sit in the same room as a visitor free of any such restraints. Dkt. 49-1 at 1–2 (Dixon Decl. ¶¶ 4–5). The Court does not doubt that having his left wrist handcuffed to the wall placed a substantial restraint on Green's freedom of movement. But, for present purposes, the question is whether, in light of the circumstances, "a reasonable person [would] have felt . . . at liberty to terminate the interrogation" and to return to the general prison population. *Howes*, 565 U.S. at 509; *see also United States v. Burden*, 934 F.3d 675, 694 (D.C. Cir. 2019) (asking whether "a reasonable person in the suspect's position would not have felt free to leave"). Given the detention facility's "general practices," Dkt. 49-1 at 2 (Dixon Decl. ¶ 6), Detective Brador's repeated assurances, and the other, relevant circumstances, the Court is persuaded that a reasonable person would have felt free to end the interview and to return to his cell.

The Court, accordingly, concludes that Green was not in "custody" for purposes of *Miranda* and thus declines to suppress his statements on the ground that Detectives Brador and Garner failed to administer the *Miranda* warnings.[3]

---

[3] Because the Court has concluded that Green's "freedom of movement" was not sufficiently curtailed to create a custodial situation, the Court need not address the second condition for

B.  **Due Process**

That leaves Green's contention that the interrogation involved the kind of coercion that would render his statements involuntary within the meaning of the Due Process Clause.  *See* Dkt. 29 at 3–5.  To succeed on this argument, Green must clear a high bar.  As the D.C. Circuit has explained, "egregious facts [are] necessary to establish that the statements [a defendant] made during questioning were involuntary."  *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012); *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").  For purposes of this inquiry, the touchstone is "whether the defendant's will was overborne when he gave his statement, and the test for this is whether the statement was a product of an essentially free and unconstrained choice by its maker."  *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (citations, quotation marks, and alterations omitted).  "[A] detective's failure to honor [a defendant's] *Miranda* right is certainly relevant to whether [the defendant's] statements were voluntary, but it is insufficient by itself to establish involuntariness."  *Id.* at 1306.

Considering all the relevant circumstances, the Court is convinced that Green's statements were voluntary.  It is true that Green was handcuffed, that the detectives strongly suggested Green was their target in a murder investigation, and that they failed to inform Green of his *Miranda* rights.  But as the D.C. Circuit has observed, the first two of these three circumstances are "inherent in any custodial interrogation"—that is, "the suspect will be in custody and will understand that the government is conducting an investigation in order to

---

finding custody—"whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*," *Howes*, 565 U.S. at 509.

determine whether to bring criminal charges." *Murdock*, 667 F.3d at 1306; *see also Mohammed*, 693 at 198 (rejecting involuntariness argument even though defendant had been "blindfolded and handcuffed at times" and "an agent lied to [him] that his hands tested positive for heroin"). Moreover, as explained above, this is not a case in which Green was subject to restraints or physical conduct other than those typically employed in that facility. Dkt. 49-1 at 1–2 (Dixon Decl. ¶¶ 4–5). And, likewise, having reviewed both the transcript and audio recording of the interrogation, the Court is unpersuaded that Detectives Brador and Garner engaged in any verbal abuse or intimidation during the relatively short interview. To be sure, detectives at times misled Green about the evidence they had—or did not have—against him, and they did not reveal that the victim was dead. But the Supreme Court has held that police tactics of that kind are permissible under the Due Process Clause, *see Frazier v. Cupp*, 394 U.S. 731, 739 (1969) ("The fact that the police misrepresented the statements that [his co-defendant] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible."); *Mohammed*, 693 F.3d at 198 (similar), and the tactics that Detectives Brador and Garner employed here were neither extraordinary nor shocking.

Finally, as for the third consideration, the Court has already concluded that Detectives Brador and Garner did not violate Green's *Miranda* rights, and—at any rate—"the Supreme Court has held, in no uncertain terms, that a *Miranda* violation alone is insufficient" to establish that a confession was involuntary. *Murdock*, 667 F.3d at 1306. The Court cannot, as a result, conclude that the circumstances of Green's questioning were so draconian that his "will was overborne." *Id.* at 1306 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).[4]

---

[4] At the pretrial conference, the Court *sua sponte* raised the question whether Green's Sixth Amendment right to counsel might warrant a limiting jury instruction clarifying that Green's

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that the government's motion to admit Green's statements to Brador and Garner, Dkt. 22, is **GRANTED**, and that Green's motion to suppress those statements, Dkt. 29, is **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss  
RANDOLPH D. MOSS  
United States District Judge

Date:  October 22, 2021

---

statements should not be considered with respect to the Cotto murder, given that Green's Sixth Amendment right to counsel had attached for purposes of the Maryland murder charge at the time of the questioning at issue here.  *See* Minute Entry (Oct. 18, 2021); *see also McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (holding that the Sixth Amendment right to counsel is "offense specific").  The Court also raised the related issue of whether the Sixth Amendment would apply in these circumstances, given that the incriminating statements were not elicited by Maryland authorities, and Green's Sixth Amendment right to counsel was triggered solely by the initiation of proceedings under Maryland law.  *See United States v. Avants*, 278 F.3d 510, 517–18 (5th Cir. 2002) (applying the separate sovereign doctrine in the Sixth Amendment context).  Since the pretrial conference, moreover, the Court has reviewed the transcript of the interview, *see* Dkt. 22-2, and has yet to identify any questions by Detectives Brador and Garner that were directed at the Cotto murder.  But, in any event, briefing on these issues remains ongoing, and the Court will resolve them at a later date.