# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHRISTOPHER GREEN,<br><br>*Defendant.* | Criminal Action No. 19-19 (RDM) |

## MEMORANDUM OPINION AND ORDER

Christopher Green is charged with participating in a Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, conspiracy and engaging in an array of related, criminal acts. *See* Dkt. 12 (superseding indictment). Green has moved for sanctions against the prosecution, Dkt. 59, because, according to Green, the government has failed to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). But because the question turns on the government's failure to preserve potentially exculpatory evidence, rather than its failure to produce existing evidence, the analysis is governed not by *Brady,* but by *Arizona v. Youngblood*, 488 U.S. 51 (1988). And under *Youngblood*, Green must "show bad faith on the part of the police" in order to demonstrate that the "failure to preserve potentially useful evidence . . . constitute[s] a denial of due process of law." 488 U.S. at 58. Green has made no such showing. To the contrary, even though Green bears the burden on this point, the government has effectively demonstrated the absence of bad faith. *See* Dkt. 66. The Court will, accordingly, **DENY** Green's motion for sanctions, Dkt. 59.

## I. BACKGROUND

Among the charges included in the superseding indictment is the allegation that, on February 23, 2017, Green assaulted Kevin Briscoe with a dangerous weapon. *See* Dkt. 12 at 9 (Count Eight). According to the government, at approximately 11:11 p.m. that evening Green fired two shots at Briscoe from a 9 mm handgun in front of an apartment building. Dkt. 66 at 1–2. When Metropolitan Police Department ("MPD") officers responded to the scene, Briscoe informed them that a different set of MPD officers had been on the scene half an hour earlier. *Id.* at 2. The body-worn camera footage from that interaction, which was produced in discovery, captures Briscoe telling the second group of MPD officers that the officers who responded to the earlier call spoke with a group of three men, one of whom was the individual who shot at him. Dkt. 59 at 2. Briscoe further explained that the shooting followed a dispute between Briscoe and Tatum Plater; that Plater and one of the three men have a child together; and that two of the men "looked alike and appeared to be brothers." Dkt. 66 at 2. "At trial[,] the government intends to show that Ms. Plater has a child with Patrick Green, the twin brother of the defendant, and that it was the defendant who fired the shots at Mr. Briscoe." *Id.*

Although the government disclosed some evidence, including body-worn camera footage, from the police encounter following the alleged shooting, the government has not turned over any such footage or any MPD paperwork from the earlier encounter. *See* Dkt. 59 at 2–3. This matters, Green maintains, because, "[u]pon information and belief, [he] was not present at the apartment complex prior to the incident or during the incident," and this fact would be borne out by the body-worn camera footage and any reports or notes about that incident. *Id.* at 6–7. The government responds that "there is no formal police report or handwritten officer notes" from the earlier encounter and that the body-worn camera footage "was deleted on June 1, 2017, pursuant

2

to a standard deletion schedule." Dkt. 66 at 3. Because no arrests were made during the first visit by the police, the government explains, that encounter was "characterized as 'Incident, No Arrest,'" *id.* at 3, and was not identified as having any evidentiary value until after the footage had been deleted, *id.* at 6. According to the government's database, moreover, no one from the MPD or the U.S. Attorney's Office "access[ed], review[ed][,] or download[ed] the files prior to their deletion on June 1, 2017." *Id.* at 6; *see also id.* at 11–14 (evidence audit trails for the two sets of footage). The government has, however, turned over a "computer-aided dispatch" report related to the incident, along with the "Axon audit trials" for the two body-worn camera footage files relating to that incident. *Id.* at 3; *see id.* at 9–14.

Relying on the government's failure to produce any body-worn camera footage or "police paperwork" from the earlier incident, Green moves for sanctions. Dkt. 59 at 3, 9.[1] He suggests, as appropriate sanctions, that the Court dismiss those counts related to the February 23, 2017, alleged shooting (Counts Eight and Nine) and bar the government from using evidence from that incident in support of its RICO conspiracy charge (Count One). *Id.* at 9.

## II. ANALYSIS

Green argues that, because the government did not preserve all of the evidence from the earlier police encounter on the evening of February 23, 2017, it has failed to fulfill its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Dkt. 59. Green is correct that *Brady* holds

---

[1] Although Green's motion focuses on the government's failure to produce body-worn camera footage, along with any "police paperwork," Dkt. 59 at 3, at the pretrial conference Green's counsel noted that "there's probably a 911 call" and "maybe radio runs," Pretrial Conf. (Oct. 18, 2021) (Rough Tr. 35), suggesting that Green may also be seeking sanctions based on the failure to produce those records. *See* Dkt. 66 at 3–4 n.1 (acknowledging this possibility). Green does not, in his reply brief, directly address this ambiguity, but he does assert that the computer-aided dispatch report "makes it apparent that the missing body-worn camera footage *and 911 call recordings* included exculpatory materials prior to their deletion." Dkt. 67 at 4 (emphasis added).

3

that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  And it is true that the D.C. Circuit subsequently extended *Brady*'s rationale to require that the prosecution, in addition to disclosing evidence in its possession, "promulgate[], enforce[] and attempt[] in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation." *United States v. Bryant*, 439 F.2d 642, 652 (D.C. Cir. 1971) (footnote omitted).  In the absence of such procedures, the D.C. Circuit held, "nondisclosure based on loss of evidence" would violate the Due Process Clause.  *Id.*

That decision from the D.C. Circuit, however, has been displaced by an intervening decision from the Supreme Court, *Arizona v. Youngblood*, 488 U.S. 51 (1988).  *See United States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016) (per curiam) ("Following *Youngblood*, . . . *Bryant*, at least with respect to due process claims based on missing evidence the exculpatory value of which is unclear, is 'no longer good law.'" (quoting *In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996)).  In *Youngblood*, the defendant was charged with child molestation, sexual assault, and kidnapping.  488 U.S. at 52.  Although the police collected the victim's underwear and T-shirt, this clothing was not refrigerated or frozen, and, as a result, investigators were unable to test semen samples that were later discovered on both items.  *Id.* at 53–54.  This was an important omission, as the defendant's "principal defense at trial was that the [victim] had erred in identifying him as the perpetrator of the crime."  *Id.* at 54.  After the jury convicted the defendant, the Arizona Court of Appeals reversed the conviction on the grounds that, "when identity is an issue at trial and the police permit the destruction of evidence that could eliminate

4

the defendant as the perpetrator, such loss is material to the defense and is a denial of due process." *Id.* at 54 (quotation marks omitted).

The Supreme Court reversed, focusing on the absence of bad faith by the government in failing to preserve the victim's clothing. The Court acknowledged that "[t]he Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Id.* at 57. "But," the Court held, "the Due Process Clause requires a different result when [courts] deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* In such circumstances, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. Returning to the facts of the case before it, the Supreme Court concluded that "[t]he failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent." *Id.* "None of this information," moreover, "was concealed from [the defendant] at trial, and the evidence—such as it was—was made available to [the defendant's] expert who declined to perform any tests on the samples." *Id.* Most crucially, "there was no suggestion of bad faith on the part of the police." *Id.* "It follow[ed] . . . that there was no violation of the Due Process Clause." *Id.*

Following *Youngblood*, "[t]o make out a claim"—such as Green's—"that the destruction of evidence violated the Due Process Clause, 'the *defendant* bears the burden of proving that the government failed *in bad faith* to preserve *material* and *potentially exculpatory* evidence.'" *United States v. Burnett*, 827 F.3d 1108, 1116 (D.C. Cir. 2016) (quoting *United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991)); *see also In re Sealed Case*, 99 F.3d at 1178. "The presence

5

or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*.

Applying these principles here, the Court concludes that Green has failed to carry his burden. Indeed, Green makes no effort to show bad faith, even after the government correctly pointed out that *Youngblood* sets forth the relevant analysis. Dkt. 66 at 4. What is more, the government has offered substantial evidence refuting any claim of bad faith. The files at issue were deleted pursuant to standard procedure, and the government has submitted evidence showing that no one from the MPD or from the U.S. Attorney's Office even accessed the body-worn camera footage before those files were deleted. *Id.* at 11–14. As in *Youngblood*, moreover, at the time the evidence was lost, "it was more likely that the evidence would have been useful to the police—who were still conducting an investigation—and to the prosecutor—who would later bear the burden of establishing guilt beyond a reasonable doubt—than to the defendant." 488 U.S. at 59 (Stevens, J., concurring in the judgment). Thus, if anything, the government "ha[d] a strong incentive to preserve the evidence," *id.*, or at least had no apparent reason to destroy it. Most importantly, there is no indication that at the time the evidence was deleted the police (or anyone else) had "knowledge of [any] exculpatory value" it might have had. *Id.* at 56 n.* (majority opinion). Indeed, it was not until January 2019—nearly two years later—that a grand jury returned the initial indictment in this case. Dkt. 1.[2] The Court,

---

[2] As for the 911 call recordings referenced by Green at the pretrial conference and in his reply brief, *see* Dkt. 67 at 4, the government represents that those recordings "were deleted, again pursuant to a standard deletion schedule, in February 2020," Dkt. 66 at 3. Although that deletion post-dated the indictment in this case, here again Green has failed to dispute the government's representation that these recordings were deleted in the normal course and has failed to offer any evidence raising even a hint of bad faith.

accordingly, concludes that Green has not shown that "the government failed *in bad faith* to preserve" any evidence from the earlier police encounter on the evening of February 23, 2017. *Burnett*, 827 F.3d at 1116 (quotation marks omitted).

None of this, of course, precludes Green's counsel from questioning the government's witnesses about the absence of evidence from the earlier police encounter or from introducing evidence of their own regarding the circumstances relevant to its deletion. The government would remain free, in turn, to ask the witnesses questions eliciting testimony about the MPD's standard procedures and how they applied in this case. But the only issue before the Court at present is whether the government's failure to preserve certain evidence from that earlier police encounter warrants sanctions pursuant to the Due Process Clause. Because Green has failed to "show bad faith on the part of the police," the answer to that question is dictated by binding Supreme Court precedent: in the absence of bad faith, the government's "failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that Green's motion for sanctions, Dkt. 59, is **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: October 29, 2021