UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHRISTOPHER GREEN,<br><br>          *Defendant.* | Criminal Action No. 19-19 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Following a month-long trial, a jury convicted Defendant Christopher Green of first-degree felony murder, attempted armed robbery, assault with a dangerous weapon, and possession of a firearm during a crime of violence.  *See* Min. Entry (Nov. 30, 2021); Min. Entry (Dec. 2, 2021).  Green has moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, arguing that the evidence was insufficient to sustain those convictions. *See* Dkt. 102 at 1.  In the alternative, he seeks a new trial, pursuant to Rule 33, "on the ground that the verdict was contrary to the weight of the evidence."  *Id*.  For following reasons, the Court will **DENY** both motions.

**I.  BACKGROUND**

On January 24, 2019, a grand jury returned a three-count indictment against Green, charging him with Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1); First Degree Murder While Armed (Felony Murder), in violation of D.C. Code §§ 22-2101 & 22-4502; and Attempted Armed Robbery, in violation of D.C. Code §§ 22-2801, 22-2802, & 22-4502.  *See* Dkt. 1.  A grand jury returned a superseding indictment some 12 months later, on December 12, 2019, charging Green with the following 13 counts: Conspiracy to Participate in a

1

Racketeer Influenced and Corrupt Organization ("RICO"), in violation of 18 U.S.C. § 1962(d) (Count One); Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts Two and Four); Unlawful Possession of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Counts Three, Five, and Seven); Kidnapping in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Six); Assault with a Dangerous Weapon, in violation of D.C. Code § 22-402 (Count Eight); Possession of a Firearm During a Crime of Violence or Dangerous Offense, in violation of D.C. Code §§ 22-401 & 22-4502 (Counts Nine, Eleven, and Thirteen); First Degree Murder While Armed with Aggravating Circumstances, in violation of D.C. Code §§ 22-2101, 22-4502, & 22-2104.01(b)(8) (Count Ten); and Attempt to Commit Robbery While Armed, in violation of D.C. Code §§ 22-2801, 22-2802, & 22-4502 (Count Twelve). *See* Dkt. 12.

Green pleaded not guilty on all counts, *see* Min. Entry (Dec. 13, 2019), and trial commenced on October 28, 2021, *see* Min. Entry (Oct. 28, 2021). The presentation of evidence closed on November 17, 2021, *see* Min. Entry (Nov. 17, 2021), and jury deliberations began the next day, *see* Min. Entry (Nov. 18, 2021). On November 30, 2021, the jury returned a partial verdict, finding Green guilty on Counts Ten and Twelve—that is, felony murder and attempted armed robbery—and not guilty on Counts Eleven and Thirteen—that is, possession of a firearm during a crime of violence or dangerous offense. Min. Entry (Nov. 30, 2021).[1]

---

[1] Green makes no contention that these verdicts were inconsistent, for good reason. The Court instructed the jury, without objection, that it was entitled to "find that the defendant was armed with a firearm at the time of the offense if the government proves beyond a reasonable doubt that the defendant was an aider and abettor in the commission of this offense, and that the defendant aided and abetted the principal's use of a firearm." Dkt. 81 at 53–54. The government's theory "was that [Green's] accomplice in the robbery, Ernest Miller, fired the one and only shot that struck [the victim] during the incident," Dkt. 105 at 4 n.3, and Green does not argue that the evidence was insufficient to establish that Green aided and abetted Miller's use of the firearm.

At the same time that the jury returned its partial verdict on Counts Ten, Eleven, Twelve, and Thirteen, it submitted a note indicating that the jurors were "unable to reach agreement on other counts," despite "lengthy, detailed discussions." Dkt. 95 at 4 (jury note). The Court, in response, issued "the anti-deadlock *Thomas* charge" the next morning, *United States v. Driscoll*, 984 F.3d 103, 107 (D.C. Cir. 2021) (citing *United States v. Thomas*, 449 F.2d 1177, 1184 nn.45–46 (D.C. Cir. 1971) (en banc)), and the jurors continued their deliberations as to the remaining counts. *See* Trial Tr. 3–4 (Dec. 1, 2021). The following day, the jury returned a guilty verdict on Counts Eight and Nine—assault with a dangerous weapon and possession of a firearm during a crime of violence or dangerous offense, respectively, Min. Entry (Dec. 2, 2021)—and indicated to the Court that it remained "unable to reach agreement" as to the remaining counts (Counts One through Seven), all of which involved an alleged RICO enterprise, Dkt. 92 at 1 (jury note). The parties, accordingly, jointly requested that the Court declare a mistrial as to those seven counts, and the Court did so from the bench. *See* Trial Tr. 15, 18 (Dec. 2, 2021).

Green sought and received several extensions to file post-trial motions challenging the convictions against him, *see, e.g.*, Min. Entry (Jan. 19, 2022); Min. Entry (Feb. 16, 2022), and on March 10, 2022 filed the instant motions for acquittal or, in the alternative, for a new trial, Dkt. 102. Although, at trial, Green moved for a judgment of acquittal on all Counts, *see* Min. Entry (Nov. 18, 2021), the motions presently before the Court focus on the four Counts on which the jury returned convictions—that is, Counts Eight, Nine, Ten, and Twelve—and do not mention the other Counts in the indictment. The government opposed both motions in a joint filing on April 14, 2022, *see* Dkt. 105, and in the intervening time period Green has neither filed a reply brief nor requested an extension of time to do so. The Court, accordingly, concludes that Green's motions are ripe for resolution.

## II.  LEGAL STANDARD

Green's motions invoke both Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure.  Under Rule 29, the Court is required, on Green's motion, to enter "a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  In assessing such a motion, the Court must construe the evidence in the light most favorable to the government and must uphold the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In making this assessment, the Court "presume[s] that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences," *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983), and, thus, "a judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt," *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983); *accord United States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008).

Under Rule 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The rules do not define 'interests of justice' and courts have had little success in trying to generalize its meaning," but the D.C. Circuit has held that "granting a new trial is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred."  *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (quotation marks omitted).  Green bears the burden of showing that a new trial is justified, *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982), and the Court has "broad discretion" in assessing his efforts to carry that burden, *Wheeler*, 753 F.3d at 208.

4

### III.  ANALYSIS

A.  **Motion for Acquittal**

In his Rule 29 motion, Green argues that the evidence was insufficient to sustain a conviction against him for each of the four counts on which the jury found him guilty, that is Counts Eight, Nine, Ten, and Twelve.  Dkt. 102 at 20.

  1.  *Counts Eight and Nine*

Counts Eight and Nine both involve the same incident, a shooting outside of the apartment building of an individual named Kevin Briscoe in February 2017.  Count Eight charges Green with assaulting Briscoe "with a dangerous weapon, that is, a firearm," "[o]n or about February 23, 2017," and Count Nine charges Green with "possess[ing] a firearm while committing the crime of assault with a dangerous weapon as set forth in Count Eight."  Dkt. 12 at 9.

The elements of those two charges are uncontested.  The Court instructed the jury that to return a conviction on Count Eight, it would need to find beyond a reasonable doubt each of the following elements: (1) Green committed a threatening act that reasonably would create in another person—here, Kevin Briscoe—a fear of immediate injury; (2) Green acted voluntarily and on purpose and not by mistake or accident; (3) at the time, Green had the apparent ability to injure Briscoe; and (4) Green committed the threatening act with a dangerous weapon—here, a firearm.  Dkt. 81 at 61; *accord Spencer v. United States*, 991 A.2d 1185, 1192 (D.C. 2010).  For Count Nine, the Court instructed the jury that, to return a conviction, it would need to find beyond a reasonable doubt that Green possessed a firearm while committing a crime of violence—here, assault with a dangerous weapon—and that Green did so voluntarily and on

purpose and not by mistake or accident. Dkt. 81 at 67. Green did not object to these instructions at trial, nor does he do so now.

Green argues that he "should be acquitted" on Counts Eight and Nine because "there is no evidence that he committed an assault with a dangerous weapon on February 23, 2017" and, *a fortiori*, no evidence that he used a firearm while committing any such crime. Dkt. 102 at 7. Green attacks the testimony offered by Briscoe, who described the incident in question for the jury, along with the testimony offered by the government's cooperating witness, Ernest Miller, who testified to statements made by Green regarding the incident after the fact. *Id.* at 7–12. The Court concludes, however, that the evidence adduced at trial—principally, the testimony of Briscoe and Miller and the government's ballistics evidence linking Green to the firearm in question—was sufficient to sustain a guilty verdict as to both Counts Eight and Nine.

Briscoe offered the most detailed testimony regarding the shooting. At trial, he explained that on February 23, 2017 he returned home from work to discover a letter with an "[i]ncome tax check" from the Internal Revenue Service with his address but another tenant's name. Trial Tr. 83–84, 86–87 (Nov. 4, 2021).[2] Briscoe testified that he thought he recognized the name—which the parties now agree was Tatum Plater, *see* Dkt. 102 at 7–8; Dkt. 105 at 6—and went to her apartment, which was downstairs from his. Trial Tr. 85–86 (Nov. 4, 2021). After Plater confirmed her name, Briscoe handed her the envelope. *Id.* at 86–87. Briscoe acknowledged that the envelope was open at the time he delivered it, but he denied having been the one to open it. *Id.* at 87.

---

[2] The parties have requested excerpts of portions of the trial, and where available the Court cites to those official transcripts. Elsewhere, the Court's citations are to the rough transcripts from trial.

Briscoe further testified that, later in the evening, a man knocked on his door and confronted him about the check, asking "[Are] you the one that gave my woman the check?" *Id.* at 89. The man "went off on a rage like[,] man why you trying to cash this check, why is the check open[?]" *Id.* at 90. A verbal argument ensued, according to Briscoe, and eventually Briscoe's brother, who at times lived with him, lunged at the man and "swung at him" and the two men began "grabbing each other" while Briscoe attempted to "pull[] them apart." *Id.* at 91–92. Briscoe testified that "Tatum [Plater] heard all the confusion" and "came upstairs with a knife." *Id.* at 92. Both Plater and Briscoe promised to call the police as the altercation died down, although only Plater ultimately seems to have done so. *Id.* at 93. The police arrived at Briscoe's door some 30 minutes later and took statements from Plater, the man who confronted Briscoe, and Briscoe. *Id.* at 94–95.

Briscoe testified that the shooting occurred a couple hours later, after he stepped outside of his building to smoke a cigarette. *Id.* at 96. Three men walked out of Plater's apartment and approached him, including "the guy that came up upstairs that [Briscoe] . . . ha[d] [a] confrontation with." *Id.* at 96–97, 104. The "guy that knocked on [Briscoe's] door . . asked [him,] 'what happens now,'" at which point Briscoe tried to go back into the building. *Id.* at 104–05. The other two men, however, "stood in the front of the door like you [are not] coming in here," prompting Briscoe to walk away. *Id.* at 105. As he did so, according to Briscoe, a man "followed behind [him] saying[,] 'man, where you think you going[?]'" *Id.* at 106. Briscoe then heard "four or five" gun shots coming from behind him, prompting him to "duck" and run for cover. *Id.* at 107. Shortly thereafter, the police arrived and questioned him about the shooting. *Id.* at 108. The government introduced into evidence footage from one of the officer's body-

7

worn cameras, and that video showed Briscoe telling the officer that two of the men who confronted him "looked like they were brothers." *Id.* at 105.[3]

Miller's testimony further connected Green to the shooting. Miller testified that he knew Green as "Twin," Trial Tr. 117 (Nov. 9, 2021), and that Green had a twin brother whose children lived in Briscoe's apartment building. *Id.* at 119, 145. On this point, Miller's testimony was corroborated in part by Charles Monk, the security officer for the apartment building, who confirmed both Plater's identity and testified that Green's twin brother frequented Plater's apartment. *See* Trial Tr. 195–98 (Nov. 2, 2021). Miller further testified that he and Green sold PCP in early 2017, and that they had both participated in the robbery of the landlord of a boarding house in which two of Green's brothers were living on February 6, 2017. Trial Tr. 120, 129–30 (Nov. 9, 2021). As for the Briscoe shooting, Miller testified that Green told him that "[t]here was an incident" at Briscoe's apartment building in early 2017, and that this incident involved the mother of Green's twin brother's child. *Id.* at 145. Miller further testified that Green claimed to have "shot the neighborhood up" in response to this incident. *Id.*

In addition to this evidence, the government introduced evidence that the firearm used to shoot at Briscoe was the same weapon used in another shooting at issue in the trial, the murder of Jan Cotto. The government offered testimony that investigators found several 9-millimeter Luger cartridge cases at the scene of the Briscoe shooting. Trial Tr. 17–18 (Nov. 9, 2021). An expert firearms tool mark examiner, who "compared the [cartridge] casing associated with" the Briscoe shooting on Southern Avenue "with those casings from the" Cotto murder on the 200

---

[3] Although the government maintains that these statements were admitted into evidence as "excited utterances and prior identification statements," Dkt. 105 at 8 n.7, the record does not reflect a hearsay objection to their introduction from the Defendant or a subsequent ruling on any such objection from the Court.

block of Zelma Avenue in Capitol Heights, Maryland and testified—with the caveat that the field of firearms tool mark comparison does not admit of absolute certainty—that "they were fired from the same unknown firearm." Trial Tr. 53–54 (Nov. 17, 2021); *see also id.* at 38 (explaining that where the expert reports indicates that two casings were "fired from the same un[known] firearm," it means that "there[] [is] enough agreement . . . under the comparison microscope that [she] would not expect them to be fired from . . . two different firearms").

This testimony is probative of Green's guilt on Counts Eight and Nine because the government also offered substantial evidence that Green fatally shot Cotto on April 6, 2017. That murder occurred outside the boarding home in which Green's brothers were living, Trial Tr. 62–64 (Nov. 2, 2021), and where Green was apparently present that evening, *id.* at 68. One of the tenants in that house came outside shortly after he heard gunshots and found Miller sitting on the porch, drinking Hennessy. *Id.* at 70–71. As that tenant asked Miller whether he heard the gunshots, Green's twin brother emerged from the house and asked Miller "where . . . his brother [was]." *Id.* at 72. Miller testified that, moments after this exchange, he saw Green "[w]alking back towards the house" with a "sweatshirt pulled over his face" and a "gun in his hand." Trial Tr. 150–51, 153 (Nov. 9, 2021). Green went directly to the boarding home's upstairs bathroom, according to Miller, where he took off his clothes and asked Miller to "[h]elp him find a way off the street." *Id.* at 156. Miller testified that he noticed, alongside Green's clothes, "a couple of [Cotto's] cards . . . in the sink." *Id.* at 155. Although the jury ultimately failed to reach a verdict as to Count Two, which charged Green with Murder in Aid of Racketeering in connection with Cotto's murder, *see* Dkt. 12 at 6–7, a reasonable jury could have believed that Green murdered Cotto even if some of jurors, for example, were unpersuaded that the government had carried its burden of proving the existence of a RICO enterprise, *see* Dkt. 81 at 46; *see also id.* 35–36

9

(defining "enterprise" for purposes of this charge). And if the jury did conclude that it was Green who murdered Cotto, it could reasonably have credited the government's ballistics evidence that the same firearm was likely used in the Briscoe shooting. *See* Trial Tr. 53–54 (Nov. 17, 2021). That connection provides compelling corroboration of the government's evidence that it was Green who shot at Briscoe on February 23, 2017.

In the face of this evidence, the Court cannot conclude, as it must to grant Green's motion, that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Wahl*, 290 F.3d at 375 (quoting *Jackson*, 443 U.S. at 319). "In making that determination, 'the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *United States v. Gaskins*, 690 F.3d 569, 577 (D.C. Cir. 2012) (quoting *Branham*, 515 F.3d at 1273). Here, Briscoe's testimony provided a motive—an altercation between Briscoe and Green's brother earlier that evening, *see* Trial Tr. 89–95 (Nov. 4, 2021)—and body-worn camera footage showed Briscoe telling the police that two of the men who confronted him involved "looked like . . . brothers," *id.* at 105. Miller, moreover, testified that the Green told him that he "shot the neighborhood up" on the night in question in response to a dispute involving his brother. *See* Trial Tr. 145 (Nov. 9, 2021). Finally, the government's ballistic evidence further connected Green to the scene of the crime. *See* Trial Tr. 53–54 (Nov. 17, 2021).

The bulk of Green's effort to undermine this evidence is directed at discrediting the testimony of Briscoe and Miller. *See* Dkt. 102 at 7–12. But that argument misunderstands the nature of this Court's review under Rule 29 and, in particular, this Court's responsibility to

10

"giv[e] full play to the right of the jury to determine credibility," *Gaskins*, 690 F.3d at 577 (quoting *Branham*, 515 F.3d at 1273). Defense counsel vigorously crossed both witnesses—indeed, Miller's cross-examination spanned three days—and the jury had ample opportunity to determine for itself the trustworthiness of his testimony, including, as relevant here, his recounting of Green's admission that he "shot the neighborhood up" following an altercation involving his brother, Trial Tr. 145 (Nov. 9, 2021), and his testimony regarding the moments after Cotto's murder, *see id.* at 150–55. That Green would have the jury disbelieve that testimony does not provide a basis for disregarding it in this posture. Nor can the Court agree with Green's assessment that Miller's testimony amounted to "accusations that are not supported by the evidence." Dkt. 102 at 12.

Green's critique of Briscoe's testimony suffers from a similar flaw. It is true that Briscoe did not identify Green as among the men who confronted him and that Briscoe could not, on the stand, confirm that the man who came to his door was Green's twin brother. *See* Dkt. 102 at 7–9. But in assessing the evidence, the Court "draw[s] no distinction between direct and circumstantial evidence" and respects the jury's "right . . . [to] weigh the evidence and draw justifiable inferences of fact." *Gaskins*, 690 F.3d at 577 (quoting *Branham*, 515 F.3d at 1273). That evidence included testimony linking Green's twin brother to Plater's apartment, Trial Tr. 143–145 (Nov. 9, 2021); Trial Tr. 195–98 (Nov. 2, 2021), and Briscoe's statement to the police immediately following the shooting that two of the men "looked like . . . brothers," Trial Tr. 105 (Nov. 4, 2021). Although that evidence, standing alone, would have provided insufficient basis to convict Green of Counts Eight and Nine, it was consistent with—and corroborated—the other evidence that Green was, in fact, one of the three men who confronted Briscoe and that Green

was the one who fired "four or five" shots at Briscoe following that confrontation. Trial Tr. 107 (Nov. 4, 2021).

The Court will, accordingly, deny Green's motion for acquittal as to Counts Eight and Nine.

    2.    *Counts Ten and Twelve*

Counts Ten and Twelve arose from the same incident: a botched robbery turned murder of Zaan Scott on April 9, 2017. Count Ten charges Green with first-degree felony murder and, specifically, with "causing" the death of Zaan Scott when he robbed or attempted to rob Scott, while Count Twelve charges him with attempted armed robbery in connection with the same incident. Dkt. 12 at 9–10.

As with Counts Eight and Nine, the elements of those two charges are not in dispute. The Court instructed the jury that to convict Green on Count Ten, the government needed to prove beyond a reasonable doubt that (1) Green caused the death of Scott; (2) Green did so while attempting to commit a robbery; and (3) at the time of the offense, Green was armed. Dkt. 81 at 62. The Court further explained that "[a]n aider and abettor is legally responsible for the principal's use of a weapon during an attempted robbery if the government proves beyond a reasonable doubt that the aider and abettor had actual knowledge that the principal would be armed with a firearm during the commission of the attempted robbery." *Id.* at 63. And, of particular relevance here, the Court instructed the jury that "[i]f two or more people, acting together, are attempting to commit a robbery and one of them, in the course of that felony and in furtherance of the common purpose to commit the robbery, kills a human being, both the person who committed the killing and the person who aided and abetted the attempted robbery are guilty of felony murder, even if the killing was accidental." *Id.* at 62.

On Count Twelve, the Court instructed the jury that armed robbery required that the government to prove beyond a reasonable doubt that (1) Green took property from the victim; (2) Green took that property from the immediate actual possession of the victim or the victim's person; (3) Green used force or violence to take the property by using actual physical violence or by putting the victim in fear; (4) Green took or carried the property away; (5) Green took the property without right and intending to steal it; (6) the property had some value; and (7) at the time of the offense, Green was armed with a firearm. *Id.* at 65. The Court further instructed the jury that it could "find that the defendant was armed at the time of the offense if the government proves beyond a reasonable doubt that the defendant was an aider and abettor in the commission of the attempted robbery, and that the defendant aided and abetted the principal's use of a firearm." *Id.* at 65–66. Because the superseding indictment charged Green with attempted armed robbery, Dkt. 12 at 10, the Court further instructed the jury that the charge of attempt required that the government prove beyond a reasonable doubt that (1) Green intended to commit the crime of armed robbery; (2) Green did an act reasonably designed to accomplish the crime of armed robbery, and (3) Green accomplished or came dangerously close to committing the crime of armed robbery. Dkt. 81 at 65.

Here again, Green takes no issue with these instructions, arguing instead that, even when "viewing the evidence most favorably to the government, the weight of the evidence at trial does not support a finding that . . . Green committed or attempted to commit a robbery on April 9, 2017." Dkt. 102 at 12. For this reason, Green maintains, the jury lacked sufficient evidence to convict him of first-degree felony murder in connection with any such robbery or attempted robbery. *Id.* For the reasons explained below, the Court is unpersuaded.

13

The government's evidence on Counts Ten and Twelve included extensive testimony from Miller, who participated in the robbery alongside Green and who, in the process, fired the shot that killed Scott. According to Miller, he and Green were on their way to a liquor store when they encountered Scott, who had his back to them. Trial Tr. 173–75 (Nov. 9, 2021). Miller testified that Green said "[c]ome on," which Miller understood to convey that Green intended to rob Scott. *Id.* at 175. Miller further testified that Green and Scott "got into . . . a tussle and ended up . . . on the ground." *Id.* at 176. Green was armed, according to Miller, *id.* at 175, and in the ensuing struggle Green's gun "ended up on the ground as well," *id.* at 176. Miller explained that he "ran up to both of them" and "then shot the guy in the back" in order "to get him off" Green. *Id.* Miller then "grabbed [Green's] gun off the ground" and ran away, but Green "stayed for a second going through the guy's pockets." *Id.* at 177. Miller's description of these events was bolstered by other evidence that he and Green had engaged in a variety of other criminal conduct together around the time of the attempted robbery and murder. *See, e.g.*, *id.* at 120, 127–32.

The government also relied on the testimony of a witness who observed the incident from a hospital parking lot across the street and gave a statement to police shortly afterwards. That witness testified that she saw three men tussling—at first she thought they were "playing"— before she heard the "sound of a shot." Trial Tr. 192–93 (Nov. 3, 2021). During trial, the government played footage from the body-worn camera of the officer who took her statement. *See id.* at 193–95, 198; *see also* Gov't Ex. Z039. In that video, the witness describes two men running from the scene, and, referring to one of the two men, motions with her hands as if she is patting herself down. Trial Tr. 199 (Nov. 3, 2021). When asked at trial to explain her hand motions, she testified, "I wanted to say that I was sure that he was looking around the victim and

14

perhaps he was looking for a wallet." *Id.* at 200–01.  The witness differentiated between the two men by testifying that, although both were Black, one had "dark skin" and the other had "light skin," and that the individual with a lighter complexion "stayed behind." *Id.* at 200.

From this evidence, a "rational trier of fact could have found the essential elements of the crime[s]" of first-degree felony murder and attempted armed robbery "beyond a reasonable doubt," *Wahl*, 290 F.3d at 375 (quoting *Jackson*, 443 U.S. at 319).  Miller placed Green on the scene, and eyewitness's testimony corroborated his account.  Indeed, both at trial and in the instant motion, Green does not dispute that he engaged in an altercation with Scott.  *See* Trial Tr. 193–95 (Nov. 15, 2022); Dkt. 102 at 15.  His argument, instead, is that he "got into a fight" and that "it was not a robbery." Dkt. 102 at 15.  But both Miller and the eyewitness's testimony offered the jury with grounds to conclude otherwise, and although Green argues at length that "Miller's . . . direct examination was suspect," *id.*, a reasonable jury could have found him truthful in his account of the incident.  Miller's testimony may have carried particular weight given the fact that he admitted (albeit after having previously pointed the finger at Green) to killing Scott.  *See* Trial Tr. 176 (Nov. 9, 2021).  Here again, the Court is precluded from evaluating Miller's credibility in the first instance.  *See Gaskins*, 690 F.3d at 577.

Green's reliance on his counsel's extensive (and at times damning) cross-examination of Miller does not undermine the jury's verdict.  To be sure, Miller admitted to writing numerous letters while detained following his arrest in which he encouraged others to offer false testimony to protect himself from liability.  Trial Tr. 182, 200–01. (Nov. 9, 2021); Trial Tr. 37, 156 (Nov. 10, 2021).  Miller also acknowledged initially identifying Green as the shooter, rather than himself—a statement that he conceded at trial was a lie.  Trial Tr. 82 (Nov. 10, 2021); Trial Tr. 26 (Nov. 15, 2021).  Although Green believes that these and other admitted falsehoods

thoroughly discredited Miller's testimony, credibility is a question for the jury, and a reasonable jury could have found that Miller's trial testimony regarding the attempted robbery and felony murder of Zaan Scott was truthful.  Notably, in that testimony, Miller made no effort to cast his own actions in a favorable light, admitting to the murder and an array of other crimes and admitting that he had previously lied and enlisted others to lie on his behalf.  *See, e.g.*, Trial Tr. 120, at 120, 127–32, 176, 182, 199 (Nov. 9, 2021).

Green also stresses that DNA tests conducted on Scott's pockets did not match Green's DNA.  Dkt. 102 at 17.  But that argument ignores that Green was charged in Count Twelve with attempted armed robbery and in Count Ten with "causing" Scott's death while committing or attempting to commit armed robbery.  Dkt. 12 at 9–10.  The Court instructed the jury as follows regarding attempted armed robbery under D.C. law:

> To establish that the defendant committed attempted robbery, the government must prove beyond a reasonable doubt that the defendant intended to commit the crime of armed robbery and that he did an act reasonably designed to accomplish the crime of armed robbery.  The government must also prove beyond a reasonable doubt that the defendant accomplished or came dangerously close to committing the crime of armed robbery.

Dkt. 81 at 65. Green did not object to this instruction at trial, nor does he do so in his current motion.  Green, likewise, does not dispute that, if (as the eyewitness's testimony indicates) he attempted to pat down Scott in an effort to "look[] for a wallet," Trial Tr. 200–01 (Nov. 3, 2021), a reasonable jury could have found that he "came dangerously close to committing the crime of armed robbery," Dkt. 81 at 65, even if he ultimately never reached inside of Scott's pockets.  The eyewitness's testimony, when combined with Miller's testimony that Green approached Scott from behind with the intention of robbing him and subsequently tackled him to the ground, Trial Tr. 175–76 (Nov. 9, 2021), is sufficient to sustain the jury's verdict.

The Court, accordingly, will deny Green's motion for acquittal as to Counts Ten and Twelve.

**B.     Motion for a New Trial**

That leaves Green's motion for a new trial pursuant to Rule 33.  Neither party devotes much attention to this alternative request for relief.  The entirety of Green's argument on this point is as follows:

> The evidence of an assault with a dangerous weapon and possession of a firearm relating to the February 23, 2017 incident and the potential robbery by Mr. Green of Mr. Scott is insufficient to sustain a conviction under Rule 29 and a judgment of acquittal is appropriate.  The same evidence warrants the court's exercising of its discretion to find that it would be a miscarriage of justice for this conviction to stand pursuant to Rule 33 and a new trial should be granted.

Dkt. 102 at 19.  The government, in turn, "submits that for the same reasons discussed [in its brief] as to why the defendant is not entitled to a judgment of acquittal on the counts of conviction, he is not entitled to a new trial on those counts."  Dkt. 105 at 27.  To the extent the parties treat Green's motion for a new trial as coterminous with his motion for a judgment of acquittal, the motion fails.  Green bears the burden of demonstrating that "a serious miscarriage of justice may have occurred," *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (quoting *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982)), and, the Court has already rejected his argument that the evidence was insufficient to sustain his convictions.

In the legal standard portion of his brief, however, Green argues that the Court "may consider the credibility of witnesses when evaluating the weight of the evidence," Dkt. 102 at 4–5, and the government seems to read Green's Rule 33 motion as a request for the Court to discount Miller's testimony, *see* Dkt. 105 at 28.  As an initial matter, the Court notes that Rule 33 does not invites a free-ranging judicial inquiry into witness's credibility; in general, it is not the Court's role to second guess the jury's credibility determinations.  To be sure, in the face of Rule

17

33 motion "based upon the insufficiency of the evidence, the Court need not accept the evidence in the light most favorable to the government, and the Court may weigh the testimony and *may* consider the credibility of the witnesses." *United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991) (emphasis added).  But Rule 33 requires a "a serious miscarriage of justice," *Wheeler*, 753 F.3d at 208, and, to warrant a new trial, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand," *United States v. Poynter*, 908 F. Supp. 2d 30, 35 (D.D.C. 2012) (quoting *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003)).  Although Green attacks Miller's credibility at length in his brief, *see* Dkt. 102 at 13–17, as his counsel did at trial, the Court is unpersuaded that crediting his testimony would result in a "serious miscarriage of justice," *Wheeler*, 753 F.3d at 208.  To the contrary, in the face of a withering, multi-day cross-examination, Miller frankly admitted that he had previously lied, tried to obstruct justice, and committed horrible crimes, including murder, while providing a coherent account of Green's complicity in several of those crimes.

      More importantly, Miller's testimony was corroborated on key points.  As for Counts Eight and Nine, the government offered Briscoe's testimony, the testimony of a security officer from the apartment building, a videotape of Briscoe's near-contemporaneous description of events to the police, and the ballistics evidence—all of which placed Green at the scene of the Briscoe shooting and offered him a motive to assault Briscoe.  Similarly, as for Counts Ten and Twelve, there was little dispute at trial that Green and Scott engaged in a physical altercation, and the eyewitness's testimony—and, in particular, the video of her statement to the police immediately after the incident—strongly support the jury's finding that Green attempted to rob Scott and that Miller shot Scott in the course of that attempted robbery.  After hearing testimony from Scott's fiancée, moreover, the jury could reasonably have concluded that Scott (an

employee of the Aquatics Division of the D.C. Department of Parks and Recreation, Trial Tr. 8 (Nov. 3, 2021)) had no reason to fight Green and, rather, was simply going to the store to purchase a soft drink before meeting his fiancée for dinner, *id.* at 14–16, 22; *cf.* Trial Tr. 21 (Nov. 18, 2021) (quoting Green's interview with Metropolitan Police Department detectives where he described "bump[ing] into" Scott, "g[etting] into a fight with [him]" and recounted that Scott "swung at [Green]").

The Court will, accordingly, deny Green's motion for a new trial as to Counts Eight, Nine, Ten, and Twelve.

## CONCLUSION

For the foregoing reasons, Defendant Christopher Green's motion for acquittal or, in the alternative, for a new trial, Dkt. 102, is **DENIED**.

**SO ORDERED**.

                                                 /s/ Randolph D. Moss
                                                 RANDOLPH D. MOSS
                                                 United States District Judge

Date:  November 15, 2022