**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **Crim. No. 19-19 (RDM)** |
| v. | : | |
| | : | |
| CHRISTOPHER GREEN, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by its undersigned counsel, hereby files this Memorandum in Aid of Sentencing. For the reasons set forth below, the Government asks that the Court sentence the defendant to concurrent sentences of 25 years on the RICO Conspiracy count and Kidnapping in Aid of Racketeering counts, and consecutive sentences totaling thirty-five years on the D.C. Code offenses.

## I. SENTENCING FACTORS

In sentencing a defendant, after calculating the appropriate Guideline range, the Court must consider the factors set forth in 18 U.S.C. Section 3553.[1] *See Gall v. United States*, 552 U.S. 38 (2007). These factors are in keeping with the traditional factors used by courts when imposing a sentence: (1) the protection of society against wrongdoers; (2) the punishment or discipline of the wrongdoer; (3) the reformation of the wrongdoer; and (4) the deterrence of others from the commission of like offenses. *See Spanziano v. Florida*, 468 U.S. 447, 477-78 (1984) (Stevens, J., concurring); *see also Williams v. New York*, 337 U.S. 241, 251 (1949). Further, under the Guidelines and Section 3553, similarly situated defendants should receive like punishments. *See* 18 U.S.C. Section 3553(a)(6).

---

[1] The final Pre-Sentence Report (PSR) has not been completed so the Government is unable to indicate whether it agrees with its Guideline estimate.

1

II. **FACTS ADDUCED AT TRIAL**

As the Court knows, following two jury trials, defendant Christopher Green was convicted of Conspiracy to Participate in a Racketeer Influenced and Corrupt Organization (RICO) in violation of 18 U.S.C. § 1962(d), Violent Crime in Aid of Racketeering—Kidnapping in violation of 18 U.S.C. § 1959(a)(1), Assault with a Dangerous Weapon in violation of D.C. Code 22-402, Possession of a Firearm During a Crime of Violence in violation of D.C. Code 22-401 and 4504(b), First Degree Murder Whiled Armed—Felony Murder in violation of D.C. Code 22-2101, 4502 and Attempt to Commit Robbery While Armed in violation of D.C. Code 22-2801, 2802 and 4502. The evidence showed the following:

A.    **The Enterprise**

The defendant, Christopher Green, also known as "Twin," between in or about January 2017 and December 2017, was a member of a criminal organization, which operated in the District of Columbia and Maryland. The principal locations at which members and associates of the criminal organization operated included, but were not limited to, the 300 block of Zelma Avenue, Capitol Heights, Maryland, the 1300 and 1400 blocks of Southern Avenue, SE, Washington, D.C., and the blocks surrounding these areas in the District of Columbia and Maryland.

The criminal organization, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1959(b)(2) ("the enterprise"), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

A principal goal of the enterprise was to obtain as much money and things of value as

2

possible through armed robberies and to a limited extent the trafficking of controlled substances, including phencyclidine (PCP). It was further a goal of the enterprise to commit acts of violence, for the following purposes, among others: to enrich the enterprise and its members financially; to protect the enterprise and its members from individuals outside of the enterprise or with interests contrary to that of the enterprise and its members; to protect the enterprise and its members from detection, apprehension, and prosecution by law enforcement; and to promote and enhance the reputation and standing of members within the enterprise.

Between January 2017 and December 2017, in the District of Columbia and elsewhere, defendant Green and other members and associates of the enterprise, knowingly and intentionally combined, conspired, confederated and agreed with each other, directly and indirectly, to engage in acts involving robbery, kidnapping, carjacking, and the distribution of controlled substances, including PCP.

During the conspiracy, defendant Green entered into an agreement with Ernest Miller and the other members and associates of the conspiracy, to, among other things, rob, kidnap, and carjack individuals and distribute controlled substances with Miller and others for the purposes of financially enriching the members of the group and protecting the members of the group from other individuals and from detection and prosecution by law enforcement. The association between defendants Miller, Green, and the others was an on-going association from January 2017 until at least mid-April 2017.

Defendant Green met Miller in 2016 at a candlelight vigil for Miller's recently deceased uncle. Miller and defendant Green became close friends and/or associates until Miller's arrest on April 13, 2017. They would see each other almost daily. Miller introduced defendant Green to his "people" in the Forest Hills neighborhood of Oxon Hill, Maryland and his family members,

allowed Green to use his personal property, such as his cell phone, and provided Green with rides and a place to stay on various occasions.  Miller also became familiar with Green's friends and family members, including defendant Green's brothers.  Miller and defendant Green attended parties together and socialized together on a frequent basis.  Miller and Green shared a variety of items throughout their friendship, such as narcotics, liquor, guns, and shoes.

Miller and defendant Green were the core members of the enterprise.  Miller and Green began committing robberies in February 2017 and enlisted friends, family members, and individuals known to them from the District of Columbia, Maryland, and elsewhere to assist in the robberies.  Miller, Green, and selected members of the enterprise used a boarding house, located at 303 Zelma Avenue, Capitol Heights, Maryland, to congregate and to store firearms, which were possessed and maintained by members of the enterprise.

### B.    <u>Distribution of Narcotics</u>

In January and February 2017, Miller began distributing PCP to defendant Green, which Green would then re-distribute to other known and unknown individuals for money. Miller provided defendant Green with approximately one to two ounces of PCP, worth about $1,500, from January 2017 to April 2017 to distribute for the purpose of financially enriching Miller and Green.

### C.    <u>Robbery of Lucius Slade on February 6, 2017</u>

The evidence showed through witness testimony that defendant Green's brothers resided at a boarding house located at 303 Zelma Avenue, Capitol Heights, Maryland during the time of the conspiracy.  Defendant Green stayed there frequently too though he was not on the lease. Defendant Green, Miller, and others were present when Lucius Slade pulled up in a dark-colored SUV.  Defendant Green knew Mr. Slade to be the owner and landlord of the  boarding house.

4

Defendant Green decided to rob Mr. Slade.  He gave a handgun to a co-conspirator (Malik Morris).  The evidence, through a reasonable inference, showed that defendant Green knew that Mr. Slade was there to pick up rent from Chaz Green, one of defendant Green's brothers.  Ernest Miller and defendant Green walked away from the area just prior to the robbery.  When they returned to 303 Zelma Avenue, Mr. Slade was standing on the front porch with no shoes or hat.

Morris later explained that he had robbed Mr. Slade at gun point.  He said he took Mr. Slade's shoes, keys, iPhone, and the money order from the tenant.  Other members or associates of the enterprise later cashed the money order ($750) and divided the proceeds with others including defendant Green.

**D.    Robbery and Murder of Jan Cotto on April 6, 2017**

On April 6, 2017, shortly before 11:00 p.m., Jan Cotto, who also resided at the 303 Zelma Avenue boarding house, left the house to go to work.  She was carrying her purse, which included her wallet, identification, and money.  Ms. Cotto was shot and killed as she approached Central Avenue, approximately two blocks from 303 Zelma Avenue.  She was shot six times.  When officers found her body, her purse was missing.

Ms. Cotto was transported to Prince George's Hospital Center on April 6, 2017, where she was pronounced dead.  An autopsy of Ms. Cotto revealed that the cause of death was multiple gunshot wounds, including one gunshot wound to the right side of the forehead and one gunshot wound to the mid forehead, and that the manner of death was homicide.

The Government's evidence showed, through the testimony of Miller, that defendant Green shot and killed Ms. Cotto.[2]

---

[2] The jury in the second trial acquitted Green of the one count directly related to the murder of Ms. Cotto-VICAR-murder.  However, that jury unanimously found that, with respect to the count of RICO conspiracy, for which they found the defendant guilty, the racketeering activity agreed to by the defendant included robbery in violation of Maryland law.

E.    **Kidnapping and Robbery of Sean Fullwood on April 8, 2017**

On the evening of April 7, 2017 into the early morning hours of April 8, 2017, defendant Green was with Miller on Wheeler Road in Oxon Hill, Maryland.  While standing in front of the Yordi Dollar Store, they had a conversation about needing money.  They saw Sean Fullwood pull up to the Yordi Dollar Store in a 4-door sedan and enter the store.  Defendant Green decided to rob Mr. Fullwod when he left the store.  He and Miller pulled out the firearms they were carrying, confronted Mr. Fullwood,and then followed him to the driver's side of his car.

They began searching Mr. Fullwood's car and found Mr. Fullwood's bankcard.  Defendant Green demanded the pin number to the bankcard from Mr. Fullwood and took the card into the Yordi Dollar Store to get money from the ATM while Miller continued to hold Mr. Fullwood at gunpoint in the car.  Defendant Green came back to the car with cash from the ATM and gave Miller approximately $80 of the proceeds.

Miller then saw someone he knew and offered to give him a ride.  This other individual got into the back seat of Mr. Fullwood's car.  Defendant Green also got into the back seat.  Miller got into the front passenger seat and began instructing Mr. Fullwood where to drive.  Miller had his firearm pointed at Mr. Fullwood as he was ordering Mr. Fullwood to drive to the Southview apartment complex, against Mr. Fullwood's will, using the route specified by Miller.

Once they arrived at the Southview apartment complex, Miller directed Mr. Fullwood to stop the car at the back of the parking lot.  The other individual who was in the back seat then got out of the car.  Miller and defendant Green searched Mr. Fullwood's car, looking for items they could take from Mr. Fullwood, such as personal property and marijuana.  Defendant Green found the title to Mr. Fullwood's car and attempted to force Mr. Fullwood sign the title over to him, but Miller convinced him not to do anything with the title of the car.

Miller then ordered Mr. Fullwood to take off his clothes and make a series of statements intended to degrade and humiliate Mr. Fullwood.  Miller threatened to kill Mr. Fullwood if Mr. Fullwood reported the incident to the authorities.  Defendant Green captured these events as they were happening through a video recording using Miller's cell phone.  In the video, Miller forced Fullwood to say that he and defendant Green were the "goat."  Miller subsequently showed this video to his friend later that night and sent the video to several of his friends and associates through a group chat.  Defendant Green later admitted to a detective from Prince George's County, Maryland that he robbed Fullwood of some clothes and shoes.  He claimed he did it because Fullwood owed him money and had not paid him back.

**F.    Murder of Zaan Scott**

On April 9, 2017, at approximately 8:30 p.m., Zaan Scott walked home from Schreiber's Country Store located at 4421 Wheeler Road, Oxon Hill, Maryland.  The evidence at trial showed that defendant Green attempted to rob him and that Miller shot Mr. Scott as Mr. Scott resisted and struggled with defendant Green.  Mr. Scott lived for a little over a month after being shot.  He was paralyzed from the waist down.  However, on May 17, 2017, while he and his fiancée were being interviewed by the Washington Post about the shooting, he began to complain that he could not breathe and lost consciousness.  He was transported to Doctor's Hospital where he was pronounced dead at 4:13 p.m.  The Maryland Medical Examiner's Office conducted an autopsy and ruled that his death was a homicide caused by an occlusive pulmonary thromboembolism in a setting of paraplegia (i.e., a blood clot) due to a gunshot wound to the back.

Miller explained that, on the evening of April 9, 2017, he and defendant Green were at the Forest Hills apartment complex in Oxon Hill, Maryland for a friend's birthday party.    Later in the evening, they began to walk to a liquor store on Wheeler Road with another individual.  They

used a shortcut that leads from the parking lot of the Forest Hills apartment complex to Southern Avenue, S.E., Washington, D.C. As they were coming towards Southern Avenue, defendant Green saw Mr. Scott walking on Southern Avenue. Defendant Green looked at Miller and motioned toward Mr. Scott who was walking alone. Miller understood that to mean that defendant Green wanted to rob Mr. Scott, and wanted his assistance, which Miller tacitly agreed to provide.

Miller testified that defendant Green pulled out a handgun and approached Mr. Scott. Defendant Green tried to rob Mr. Scott, but Mr. Scott grabbed defendant Green's gun, and it fell on the ground. Defendant Green and Mr. Scott got into a physical struggle on the sidewalk and both ultimately fell to the ground. Miller then took out his own handgun and fired one shot at Mr. Scott, striking Mr. Scott in the back. Miller said he did so to get Mr. Scott off the defendant.

Miller began to flee back towards the Forest Hills apartment complex. He turned back and saw defendant Green going through Mr. Scott's pockets. He yelled at defendant Green to flee the scene. The two later met up again at the Forest Hills apartment complex.

Miller's account was corroborated by other witnesses and by physical evidence. His account is, in part, corroborated by defendant Green's own statement. On June 28, 2017, after his arrest in Maryland for the murder of Jan Cotto, defendant Green spoke to Metropolitan Police Department (MPD) detectives about the Zaan Scott shooting. Defendant Green stated that he and the accomplice attended a cookout that evening. Defendant Green claimed he had just left the cookout alone and was jogging to the metro station when he ran up behind Mr. Scott. Mr. Scott turned around and confronted defendant Green, claiming that defendant Green was trying to rob him. Defendant Green claimed that Mr. Scott began hitting him in the face. Defendant Green claimed he heard a gunshot and that he then ran away from the area.

Defendant Green initially denied knowing who fired the gun and claimed that he did not

see the shooter.  When detectives challenged his account of events, defendant Green admitted that he was there with Miller and that Miller had a gun.  He claimed that Miller ran up to Mr. Scott during the fight, shot Mr. Scott at close range, and then fled the scene.  Defendant Green also stated that he remained on scene for a few seconds to pick up various items he had dropped during the fight, including his wallet and smart trip card.

Another witness who was across the street from the shooting in a parking lot largely confirmed the accomplice's account.  She testified that she heard a gunshot and saw two male suspects run from the scene in the direction of Wheeler Road, S.E., Washington, D.C.  She testified that the  first suspect ran from the scene immediately after the gunshot.  The second suspect stayed back and appeared to be patting down Mr. Scott's body before also running away.

Cell site communications place both the accomplice's cell phone and defendant Green's cell phone in the 1300 block of Southern Avenue on the evening that Mr. Scott was attacked.  While the cell site expert could not testify as to who was using the cell phones or precisely where they were, his testimony also helped corroborate the accomplice's account.

Finally, on April 13, 2017, detectives from Prince George's County, Maryland were investigating the homicide of Jan Cotto, whose murder was included in the federal offenses charged against the defendant, when they observed a silver 2000 Lincoln Navigator,  parked in the area where the Maryland homicide occurred.  Several individuals, including Miller, were standing next to the Navigator.  When detectives approached, they smelled marijuana coming from the vehicle.  The owner of the car consented to a search of the vehicle.  During the search, detectives recovered a loaded, black and silver KAHR 9mm handgun under the front passenger seat.  A firearms examiner determined that the KAHR 9mm handgun recovered that day was ballistically linked to the fired cartridge casing found next to where Mr. Scott was shot.

G.    **Armed Assault of Kevin Briscoe**

On February 23, 2017, officers responded to 2540 Southern Avenue, S.E., Washington, D.C. in reference to a shooting.  Kevin Briscoe reported that he returned some mail to his neighbor, Tatum Plater, that evening that had been mistakenly delivered to his residence.  Ms. Plater testified that Mr. Briscoe said she should give him something for returning the mail.  She refused.  Mr. Briscoe then became belligerent and threatened to rape her and her children.

Defendant Green's twin brother, Patrick Green, is the father of Ms. Plater's child.  He came to the apartment complex and attempted to calm things down.  His attempt failed, however.  The testimony showed that defendant Green then arrived at the apartment complex.  As Mr. Briscoe was walking away, the evidenced showed that defendant Green shot at him.  Fortunately, however, Mr. Briscoe was not hit.

Miller testified about this incident as well.  He reported that defendant Green later stated to him that he "shot up the joint," referring to the "dudes" involved in the altercation with the mother of Patrick Green's child.  Importantly, the fired cartridge casings recovered at the scene of this shooting are ballistically linked to the fired casings found at the scene of the murder of Ms. Cotto.

III.    **VICTIM IMPACT**

The Government has provided sentencing information to all the victims in this case.  One or more of them (including Ms. Cotto's sister) may ask to address the Court at sentencing.

IV.    **SENTENCING CONSIDERATIONS**

A.    **Statutory Penalties**

Pursuant to 18 U.S.C. § 1963, because the jury did not reach a verdict on the special sentencing factors, the maximum penalty for Green's RICO conspiracy conviction is twenty years.

10

The penalty for kidnapping in aid of racketeering is for any term of years up to life.  18 U.S.C. §1959(a)(1).

B.  **District of Columbia Penalties and Guidelines**

The statutory maximum penalty for the assault with a dangerous weapon (ADW) charge in Count Eight is 10 years in prison (without any mandatory minimum term), under D.C. Code § 22-402, followed by three years of supervised release (assuming the court imposes a sentence of at least one year in prison), pursuant to D.C. Code § 24-403.01(b)(3)(B).  However, under D.C. Code § 24-403.01(b-1), the maximum prison term the court can impose at initial sentencing must be off-set by the maximum prison term the court could impose if the court were later to revoke the defendant's supervised release.  Accordingly, the maximum prison term that the court can impose at initial sentencing for Count Ten is eight years in prison.  *See* D.C. Code § 24-403.01(b)(7)(C).  In addition, the court can impose a maximum fine for this count of $25,000.  *See id.* §§ 22-402, 22-3571.01(b)(7).

Under the D.C. Superior Court Voluntary Sentencing Guidelines, the offense of ADW is in Group 6.  *See* DCVSG Appx. A.  The defendant has a criminal history score, under these guidelines, of ¼ point based on a 2011 adult misdemeanor conviction for possession of an unregistered firearm, in violation of D.C. Code § 7-2502.01(a), in *D.C. v. Christopher Green*, 2011 CDC 000652 (D.C. Super. Ct.).  Accordingly, his guideline range of imprisonment for Count Eight is 18 to 60 months.  *See* DCVSG Appx. A.

The maximum statutory prison term for the offense of possession of a firearm during the commission of a violent offense (PFCOV), the conviction in Count Nine, is 15 years, *see* D.C. Code § 22-4504(b), although at initial sentencing the maximum term that can be imposed is only 13 years, *id.* § 24-403.01(b)(7)(C), (b-1).  There is also a mandatory minimum prison term of 5

years. *Id.* § 22-4504(b). In addition, after completing his prison term, a defendant convicted of PFCOV must serve a period of supervised release of 3 years. *Id.* § 24-403.01(b)(2)(B). A defendant so convicted can also be fined up to $37,500. *Id.* § 22-3571.01(b)(8).

Under the D.C. Superior Court Voluntary Sentencing Guidelines, the offense of PFCOV is in Group 5. *See* DCVSG Appx. A. With a criminal history score of ¼ point, the DCVSG sentencing range of imprisonment for the defendant, for this count, is 36 to 84 months per Appendix A. *See id.* However, given that by statute the offense has a mandatory minimum term of 5 years, which is greater than 36 months, the guideline range of imprisonment for this count becomes 5 years to 84 months. *See* DCVSG § 3.5.

For Count Ten, first degree murder while armed with aggravating circumstances, the statutory maximum is 60 years in prison, with a mandatory minimum term of 30 years in prison. *See* D.C. Code §§ 22-2104(a), 22-2104.01(a). The court must also impose a supervised release term, to follow the prison term, of 5 years. *Id.* § 24-403.01(b)(2)(A). The defendant can also be ordered to pay a fine of up to $125,000. *Id.* § 22-3571.01(b)(11). Under the D.C. Superior Court Voluntary Sentencing Guidelines, the guideline range of imprisonment for this offense, for a defendant with ¼ criminal history point, is 360 to 720 months in prison. DCVSG Appx. A.

For Count Twelve, attempted robbery while armed, the statutory maximum penalty is 33 years in prison, with a mandatory minimum of 5 years. D.C. Code §§ 22-2082, 22-4502(a)(1). The court must also impose a supervised release term of 5 years, to follow the prison term. *Id.* § 24-403.01(b)(2)(A). The defendant can also be ordered to pay a fine of up to $125,000. *Id.* § 22-3571.01(b)(11). Under the Superior Court guidelines, the range of imprisonment for an offender with ¼ criminal history point is 18 to 60 months, before consideration of any statutory mandatory

minimum.  *See* DCVSG Appx. A, Appx. C at C-16.  However, given the mandatory minimum is 5 years, the guideline sentence for this count, for this defendant, is exactly 5 years.  *See id.* § 3.5.

The Superior Court guidelines also have provisions governing sentencing on multiple counts.  In applying these provisions, it is necessary to determine whether any of the counts involves a "crime of violence" and if there are multiple such crimes, whether they involve different "victims" or different "events."  *See id.* § 6.1 ¶ a.  In this case, Counts Eight, Ten and Twelve all involve crimes of violence, *see id.* §§ 6.1 ¶ a1. n. 35, 7.5 (both referencing D.C. Code § 23-1331(4)), with Count Eight involving a different victim (Mr. Briscoe) from Counts Ten and Twelve (both Mr. Scott).  In addition, Count Eight is a different event from the single event involving Counts Ten and Twelve.  *See id.* §§ 6.1 ¶ a1 n. 36, 7.11.  Under section 6.1 of the guidelines a guideline-compliant sentence for Count Eight must be consecutive to either Count Ten or Twelve, but not both.  And for Counts Ten and Twelve, involving a single event and a single victim, the guidelines leave it entirely to the court's discretion whether to impose concurrent or consecutive sentences.  *See id.* §§ 6.1 ¶ a, 6.3.  For Count Nine, the lone count of conviction that is not a crime of violence, the guidelines also leave it entirely to the court's discretion whether the sentence should run concurrently or consecutively with any other sentence.  *See id.* §§ 6.1, 6.2, 6.3.

## V.    RECOMMENDED SENTENCE

### A.  D.C. Code Offenses

As noted above, the minimum-mandatory sentence for the felony murder of Zaan Scott is 30 years.  The minimum-mandatory sentence for both the possession of a firearm during a crime of violence, and attempted robbery while armed, is five years.   The Government submits that the Court should give recognition to the defendant having been armed and in possession of a firearm,

13

when he attacked Mr. Scott, by sentencing the Defendant to 35 years for this set of offenses, as opposed to running the sentences fully concurrently.

**B.  Federal Offenses**

In sentencing defendant Green on the federal counts, the Court's focus should be on his role in the armed robbery of Mr. Slade, his role in kidnapping and robbery of Mr. Fullwood, and his role in the robbery and murder of Ms. Cotto.  The Government believes a sentence of 25 years is the minimum sentence appropriate for these crimes.

**1.  Nature and Circumstances of the Offense**

Importantly, the Government's evidence at the trials was that in each of these offenses, defendant led the criminal conduct.  He knew that Mr. Slade was coming there that night to collect rent from his brother.  He gave a gun to co-conspirator who pointed at Mr. Slade's face and demanded his wallet, his keys, and his phone.  The co-conspirator also made Mr. Slade remove his shoes.

Likewise, defendant Green initiated the robbery of Mr. Fullwood.  He took his ATM card withdrew money from it and later started to force Mr. Fullwood to sign over the title of his car. To be sure, Mr. Miller played an equal part in this horrific crime and forced Mr. Fullwood to strip while defendant Green filmed it on Miller's phone.  Finally, the Government's evidence showed that defendant Green robbed and fatally shot Ms. Cotto, notwithstanding that he was acquitted of VICAR-murder in connection with the incident.  A sentence of 25 years is certainly appropriate for these three crimes.

**2.  Deterrence and the Need to Protect the Public**

As noted above, defendant Green committed a series of brutal crimes over a few months. Moreover, he has shown no remorse for his actions.  Indeed, he went so far as to justify what he

did to Mr. Fullwood by falsely claiming that Mr. Fullwood owed him money and even sought to blame Mr. Scott's death on Mr. Scott's mistaken belief that he (Green) was robbing him. Accordingly, the Government believes a considerable sentence is necessary for purposes of deterrence.

### 3.  **History and Characteristics of the Defendant**

The defendant is 38 years old and has his high school diploma. He has had, at best, sporadic employment.

The Government acknowledges that the defendant had a difficult, chaotic upbringing as outlined in the PSR. However, that cannot justify his actions. He was thirty years old when he committed the crimes in this case. Accordingly, his history and background do not provide a significant mitigating factor.

### 4.  **Need to Avoid Sentencing Disparities**

The Government believes that a sentence within the Guidelines will generally avoid unwanted sentencing disparities among defendants who have committed similar crimes. Indeed, the D.C. Circuit has said that, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). Here, the Guideline for the kidnapping of Mr. Fullwood alone is 188-235 months. Therefore, a total sentence of 25 years on the federal offenses is certainly appropriate.

## VI.  **CONCLUSION**

For the foregoing reasons, the Government asks that the Court sentence the defendant to a total sentence of 60 years incarceration, 35 years on the D.C. Code offenses and a consecutive sentence of 25 years on the federal offenses.

<div style="margin-left:40%">

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

By:    _____/s/_____
NIHAR R. MOHANTY
Assistant United States Attorney
D.C. Bar No. 436-686
MICHAEL C. LIEBMAN
Assistant United States Attorney
D.C. Bar No.  479-562
601 D Street, N.W.
Washington, DC 20530
(202) 252-7700
Nihar.Mohanty@usdoj.gov

</div>